WILLIAM H. ASPINWALL, JOSEPH W. ALSOP, HENRY CHAUNCEY, CHARLES GOULD, AND SAMUEL L. M. BARBOUR, PLAINTIFFS, *v.* THE BOARD OF COMMISSIONERS OF THE COUNTY OF DAVIESS

The charter of the Ohio and Mississippi Railroad Company, passed by the Legislature of Indiana in 1848, and a supplement in 1849, authorized the county

*Aspinwall et al. v. Commissioners of the County of Daviess.*

commissioners of a county through which the road passed to subscribe for stock and issue bonds, provided a majority of the qualified voters of the county voted, on the 1st of March, 1849, that this should be done.

The election was held on the appointed day, and a majority of the voters voted that the subscription should be made.

But before the subscription was made, the State adopted a new Constitution, which went into effect on the 1st November, 1851. One of the articles prohibited such subscriptions, unless paid for in cash, and prohibited also a county from loaning its credit or borrowing money to pay such subscriptions.

In 1852, the county commissioners of Daviess county subscribed for stock in the railroad company, and issued their bonds for the amount.

The provisions of the railroad charter, authorizing the commissioners to subscribe, conferred a power upon a public corporation or civil institution of Government, which could be modified, changed, enlarged, or restrained, by the legislative authority, the charter not importing a contract, within the meaning of the clause of the Constitution prohibiting a State from passing a law impairing the obligation of contracts.

The mere vote to subscribe did not, of itself, form such a contract with the railroad company as would be protected by the 10th section of the 1st article of the Constitution of the United States. Until the subscription was actually made, the contract was unexecuted.

The bonds were issued in violation of the Constitution of Indiana, and are therefore void.

THIS case came up from the Circuit Court of the United States for the district of Indiana, on a certificate of division in opinion between the judges thereof.

The nature of the case and the certificate of division in opinion are stated in the opinion of the court.

It was argued by *Mr. Vinton* and *Mr. Benjamin* for the plaintiffs, upon which side there was also a brief filed by *Mr Judah*, and by *Mr. Porter*, upon a brief filed by himself and *Mr. McDonald*, for the defendants.

The points for the plaintiffs were very much illustrated by *Mr. Vinton* and *Mr. Benjamin*, in their arguments. Essentially, however, they are stated in the brief of *Mr. Judah*, from which the following statement of them is taken:

The first question on which the judges differed relates to the nature of the right granted by the act of incorporation, and by the amendment to that act to the railroad company, to

receive county subscriptions. In other words, was it a vested right, beyond the reach of a law or Constitution made afterwards?

There is no provision in the new Constitution of Indiana as to existing rights, either personal or corporate, except the ordinary declarations, "No man's property shall be taken by law, without just compensation."

Art. 1, sec. 21.

And "no law impairing the obligation of contracts shall ever be passed."

Art. 1, sec. 24.

We assume that the property of private corporations is protected by section 21.

By the act of incorporation, a capital of five millions is contemplated; but the company is allowed to organize on the subscription of two hundred thousand dollars, and a payment at the time of subscription is required. By the 12th section, counties are authorized to subscribe for stock, as, by the 6th section, all persons of lawful age and all corporations of the United States may subscribe. Does the power exist anywhere to restrain these rights, against the will of the company? If the company may be deprived of one of these classes of subscribers, it may be deprived of all; and thus its entire capacity may be destroyed, and itself in effect annihilated.

But it is argued that counties are municipal corporations; that municipal corporations are under the control of State legislation; and that those who contract with them contract subject to this control. And we answer, it is true that muncipal corporations are subject to the control of the Legislature. That is the general rule. Is there not, in the nature of things, an exception? If the Legislature creates a municipal corporation, and endows it with other powers—with powers "to contract and be contracted with;" with powers of a private and not of a political nature; with powers including the rights and duties and obligations of private corporations and individuals—does it not create an exception as to such rights, duties, and obligations? In such case, the Legislature may control, may dissolve the corporation, but the rights, the duties, and obliga-

tions, will remain chargeable on its property. And we refer to the opinions of this court in at least two cases.

Mumma v. Potomac Co., 8 Peters, 280.

Curran v. State of Arkansas, 15 How., 310.

The second question on which the judges differed covers more ground than the first question.

The declaration states and the demurrer admits an election and vote in favor of subscription in March, 1849, before the new Constitution. The question is, whether, by virtue of the act of incorporation and the amendment, and the election, the railroad company acquired such right to the subscription as would be protected by the Constitution of the United States.

We submit that this question only differs from the first question in being, if anything, stronger than the first in favor of the plaintiffs. In the first, a mere right, dependent on a certain discretion, is claimed. In this a right is claimed, so perfected that nothing remained but the discharge of a ministerial duty.

The law is plain : "And if a majority of the votes given shall be in favor of subscription, the county board of said county shall subscribe."

Sec. 2, act Jan. 15, 1849.

There is no discretion. There is only a duty; and this, by the law of Indiana, may be enforced by mandamus. Writs of mandate issue " to compel the performance of an act which the law specially enjoins."

Section 739.

And "obedience to such writs may be enforced by attachment, and fine or imprisonment, or both."

Sec. 745, 2 Rev. Stat., 197, 198.

Hence, when the new Constitution took effect, there was an absolute vested right in the company to $30,000 subscription from the county of Daviess, to be paid in bonds of a certain description ; and we submit, that this right is a matter of contract, secured by the Constitution of the United States.

Planters' Bank v. Sharp, 6 How., 301.

Slack et al. v. Lex. and Maysville Railroad Co., 13 B. Munroe, 1.

And so in 12 Ben. Munroe, 150.

The counsel for the defendants, after stating the case, made the following points:

By the statutes of Indiana, county commissioners are bodies "corporate and politic."

1 R. S. of 1852, p. 225.

The declaration charges them as "a corporation created by the State of Indiana." Touching the matter in controversy, the first act which they performed—that of subscribing the stock—they performed as a corporation, on the 10th September, 1852. And the question is, did the Constitution of 1850 prohibit that act? We say it did. And in support of this view, we suggest the following considerations:

1. The constitutional prohibition is that "no county shall subscribe for stock in any incorporated company, unless the same be paid for at the time of such subscription." The spirit and intent of this clause seem very plain. Certainly the design was to prohibit counties from involving their people in debt for corporation stocks. And it is equally certain that any subscription by which such a debt is created is within the prohibition. Nor is it less clear that the prohibition applies to all such debts, whether created directly or indirectly for such stocks. The mischief intended to be guarded against was the burdening of the people with taxes to pay debts contracted for corporation stocks. And the power to impose that burden in any manner is the thing prohibited.

2. Was the stock "paid for at the time of the subscription?"

The existence of this suit is an answer to the question.

The phrase, "paid for at the time," in the Constitution, certainly means more than the making of a promise or obligation to pay. The writer of the declaration in question no doubt intended, in drawing it, to escape the prohibition in the Constitution by averring that "in payment for the said stock" the bonds were executed. But this is a mere evasion. The making of the coupon bonds could not be a payment within the meaning of the Constitution; at most, it was only an engage-

ment to pay. If the Constitution tolerates such a mode of payment as that, its provision is utterly idle. For then every county may run in debt as much as it pleases for corporation stock by the mere trick of saying the stock was "paid for at the time" by making bonds. It is obvious that, upon such a construction, the very evil intended to be guarded against—burdening the county with debt—would still exist in full vigor; and that not only the chief object, but the sole object of the prohibition would be thwarted.

Payment is a technical term, and in strictness implies the discharge of a debt by the delivery of money. Thus, in pleading, if the defence is that we have done what we engaged to do, we allege, in cases of engagements to do something besides paying money, performance, and in cases of money debts, we plead payment. Every lawyer knows the distinction between the pleas of performance and payment. The Supreme Court of Indiana has held that a plea of payment in anything else than money is a bad plea.

Sinard *v.* Patterson, 3 Blackf., 353.

The two words debt and payment always refer to money. Thus we say we pay a debt, and we perform a contract for the delivery of property, or to do work.

The constitutional provision in question requires that the stock subscribed "be paid for at the time of such subscription." Payment must be simultaneous with the subscription. In this case, we contend that payment has not yet been made; but if even in this we were wrong, still it does not appear that the payment alleged in the declaration was made "at the time" of the subscription. The averment is, that "afterwards, to wit: on the day and year aforesaid, in payment for said stock," the bonds were issued.

The "subscription" mentioned in the declaration must, in terms, have been a money subscription, an engagement to pay money for stock. The declaration says, that "in conformity with the said acts, the defendants subscribed for 600 shares," &c., "of the value of $30,000." The subscription, then, was "in conformity with the acts." These acts give the form of

the subscription. It is found in the fifth section of the charter of 1848, thus:

" We, whose names are subscribed hereto, do promise to pay to the president and directors of the Ohio and Mississippi Railroad Company the sum of fifty dollars for every share of stock set opposite to our names, respectively, in such manner, proportions, and times, as shall be determined by said company in pursuance of the charter thereof."

This is the only form of subscription given in the two acts. Section 5 of the charter requires this form to be pursued. Both by the declaration and the charter, it must be supposed to have been pursued in the subscription under consideration. It was undoubtedly an engagement to pay money "in such manner, proportions, and times," as the company should afterwards determine.

Now, as the engagement was to pay in money, the delivery of something else—bonds, for example—could not in any event amount to payment, unless accepted by the company as payment. It would indeed then be an accord and satisfaction, and not a payment. But even supposing that it might be regarded as payment, it certainly could not be so considered unless it was received as such by the company. This is the doctrine of Maze *v.* Miller, 1 Wash. C. C. R., 328.

Now, the declaration has no averment that the company ever received these bonds either as payment or in accord and satisfaction. It therefore does not appear that payment for the stock was made " at the time " of the subscription.

The Supreme Court of Indiana has given a construction to the prohibitory clause in the Indiana Constitution. They say, " This section, by implication, concedes the power to counties to take stock, at all events by permission of the Legislature, in companies chartered to construct works of internal improvements, under the new Constitution, by making cash payment at the time."

The City of Aurora *v.* West, 9 Ind. R., 78.
Cash payment is the meaning of the section.

Even if the stock was paid for at the time, still the transaction was clearly in violation of that part of the Indiana Consti-

tution which declares that no county shall " loan its credit to any incorporated company."

Undoubtedly the issuance of the bonds in question was lending the credit of the county to this railroad company. This was the prime object of the transaction. The bonds were drawn in the usual form to be put into the market. They were put into the market, or the plaintiffs would never have got them; and putting them in market was using the credit of the county which it had loaned to the company.

3. It is said by the plaintiffs that the vote to take stock, given by the people of Daviess county before the Constitution of 1850 took effect, amounts to a contract, the obligation of which is protected by the Federal Constitution against the prohibition in the Constitution of Indiana.

It is understood that the plaintiffs claim, first, that the vote amounted to a "contract" within the 10th section of the 1st article of the Federal Constitution; and, secondly, that the prohibition in the Indiana Constitution is in violation of the company's charter, which permits " the county commissioners of any county through which the railroad passes" to subscribe stock. Let us examine each of these points:

1. Did the vote of the people amount to a "contract," which the Federal Constitution protects? We say, no; for that vote was not a contract at all. " A contract is an agreement upon a sufficient consideration to do or not to do a particular thing." "An agreement" is the binding assent of both parties. This *aggregatio mentium* is indispensable to every contract. In this sense, the people of the county could not by vote enter into an " agreement;" for they are not a body politic, and they cannot be sued. It is the board of commissioners that can agree, not the voters. This contract is not alleged to have been made with the voters, but with the commissioners. Not the voters, but the commissioners, are sued. If the vote amounted to a contract, it was the contract of the voters; and it will be time enough, when these voters are sued, to inquire whether they contracted. It is, for the present, enough to know that the present defendants, the board of commissioners, never contracted till after the Constitution of 1850 took effect.

And if the voters had power to make a contract by a vote to take stock, still their vote could not amount to a contract till the company also agreed. To a contract there must, of course, be the assent of both parties. Now, it does not appear by the record that the railroad company ever assented to this supposed contract till the time of the subscription, which, as we have seen, was long after the constitutional prohibition took effect. As, then, there was no assent by both parties till after the first day of November, 1851, there could have been no contract till after that day. And as the making of the contract after that day was prohibited by the Indiana Constitution, there could not have been, in the case, any contract protected by the Federal Constitution.

The case of the Baltimore and Susquehanna Railroad *v.* Nebit, 10 Howard, 395, is fully in our favor on this point. There the charter provided that the company might take land for the use of the road, upon having the damages to the owner assessed by a jury, and upon tender of such damages to the owner. Damages had been so assessed, and afterwards, and before a tender, the Legislature, by law, set aside the assessment. The question was, did this violate a contract? And it was held that it did not, because, there having been no tender, no acceptance by the corporation, there was no contract. And the reasoning of Mr. Justice Daniel, on p. 399, *supra,* applies with full force to the present case.

Whether there was a subsisting contract at any time before November 1, 1851, may be tested by inquiring whether it could before that time have been enforced against the company. Suppose that before that date, and after the voting, the county commissioners had insisted on their right to subscribe pursuant to the vote, and the company had refused to take the subscription, it is perfectly clear the company would not have been liable for such refusal. The obvious answer to any action for so refusing would have been, that the company had never assented to the proposition presented by the voters to take stock.

2. Is the prohibition in the Indiana Constitution in violation of the company's charter, which provided that county sub-

scriptions of stock might be taken ? In other words, since a charter is in some respects and in some sense a contract, is the provision in the charter of the Ohio and Mississippi Railroad Company, allowing counties to subscribe for stock therein, such a contract as is contemplated by the Federal Constitution ?

All the provisions of the charter and its amendments touching county subscriptions are above copied into this brief. These provisions gave no vested right of property to the company; they merely bestow on counties the power to subscribe for stock—a power which, by the general laws of Indiana, did not before exist. They merely operate as enabling acts—as acts removing disabilities.

Touching the constitutional prohibition against the passage of laws "impairing the obligation of contracts," Mr. Story says: "That the framers of the Constitution did not intend to restrain the States in the regulation of their civil institutions, adopted for internal government, is admitted; and it has never been so construed."

Story on the Constitution, sec. 1392.

Undoubtedly, the Indiana Legislature might at any time repeal all laws incorporating counties and county boards, and thus disable them from subscribing for any stock or making any contract. Nor is it to be for a moment tolerated that the Legislature of Indiana, by granting a charter to a railroad company, could have intended to abandon any portion of its legislative power over the counties of the State.

As every charter stands, all natural persons not laboring under disabilities may take stock. But who ever thought that the Legislature may not, after the grant of the charter, by law impose disabilities on some of these natural persons? Suppose that at the time of the passage of a charter, married women were by law capable of contracting by subscribing for stock, can it be said that the Legislature cannot afterwards by law impose on them the usual disability of femes covert? So, we think it clear that the Constitution of Indiana might impose on the counties the disability in question.

In the case of the Richmond, &c., Railroad Company *v.* the

Louisa Railroad Company, 13 Howard, 71, where the Legislature of Virginia, in a charter, gave a pledge not to allow any other railroad to be constructed near the one chartered, and afterwards another railroad was chartered contrary to that pledge, it was held that the first charter was not violated within the meaning of the United States Constitution touching the obligation of contracts. That was certainly a much stronger case than the one now under discussion; and as long as it stands for law, surely the defendant in this case is safe.

The case of Covington and Lexington Railroad Company *v.* Kenton County Court, 12 B. Munroe, 144, is in point on this question. There the charter of the company had authorized the county court, under a certain vote of the people, to subscribe stock. The people had voted for it, but the County Court refused to subscribe, and in the mean time the Legislature repealed the provision of the charter authorizing county subscriptions. This repeal was held no violation of a contract, because, "until an actual subscription of the stock was made, no right to it vested in the company."

Upon the whole, we submit that it is perfectly clear that the question propounded in this case, for the decision of the court, ought to be decided in the affirmative.

Mr. Justice NELSON delivered the opinion of the court.

The case comes up from the Circuit Court of the United States for the district of Indiana.

The suit was brought by the plaintiffs against the board of commissioners of the county of Daviess, to recover two instalments of interest accruing upon certain bonds issued by the board for stock subscribed to the Ohio and Mississippi Railroad Company; and on the hearing the following questions arose, upon which the judges of the court divided in opinion:

1. Whether, by the said act of incorporation of the said railroad company, and the amendment thereto of January 15, 1849, any such right to county subscriptions vested in said company as would exclude the operation of the new Constitu-

tion of Indiana, which took effect on the 1st day of November, 1851.

2. Whether, by virtue of the said acts, and of the said election in the declaration set forth, the Ohio and Mississippi Railroad Company acquired any such right to the subscription of the defendants as would be protected by the Constitution of the United States against the new Constitution of Indiana, which took effect on the 1st day of November, 1851.

The charter of the railroad company, passed February 14, 1848, provides that it should be lawful for the county commissioners through which the road passed to subscribe for stock on behalf of the county, at any time within five years after the opening of the books of subscription, if a majority of the qualified voters of said county, at an annual election, shall vote for the same.

The amended act of January 15, 1849, made the holding of the election in the county peremptory on the first Monday of March (then) next, to determine the question of subscription or not to the stock.

The election was held in pursuance of this law, and a majority of the votes of the county cast in favor of the subscription. This was on the first Monday of March, 1849; and on the 10th September, 1852, the board of commissioners in pursuance of the acts and of election aforesaid, subscribed for six hundred shares of the stock of the railroad company, of the value of $50 per share, in the whole amounting to $30,000, and in payment of said stock issued thirty bonds, of $1,000 each, duly signed and sealed by the president of the board of commissioners, and attested by the auditor of the county, and delivered the same to the president and directors of the railroad company. By the terms of the obligations, they were made payable at the North River Bank in the city of New York, twenty-five years from date, to the railroad company or bearer, with interest at the rate of six per cent. per annum, payable annually on the 1st March, at the bank aforesaid, upon the presentation and delivery of the proper coupons attached, signed by the auditor of the said county. The plaintiffs are the holders and owners of sixty of these coupons

The new Constitution of the State of Indiana contains the following provision :

" No county shall subscribe for stock in any incorporated company, unless the same be paid for at the time of such subscription ; nor shall any county loan its credit to any incorporated company, nor borrow money for the purpose of taking stock in any such company." Sec. 6, art. 10, Constitution of Indiana.

This Constitution took effect on the 1st November, 1851. The subscription was not made nor bonds issued by the board of commissioners of the county, as we have seen, until the 10th September, 1852. The question therefore arises, whether the subscription and bonds, thus made and issued after the Constitution went into effect, were not forbidden by the 6th section of the 10th article above cited, and therefore null and void.

The precise question first presented by the court below, upon which the judges divided, is as follows :

Whether, by the said act of incorporation of said railroad company, and the amendment thereto of January 15, 1849, any such right to county subscriptions vested in said company as would exclude the operation of the new Constitution of Indiana, which took effect on the 1st November, 1851.

The question admits, at least by implication, that this sixth section of the Constitution applies to the acts of the board of commissioners, in making the subscription and issuing the bonds ; but presents the question, whether, at the time it went into effect, there was not such a right to the subscription and bonds vested in the railroad company as could be upheld, notwithstanding the constitutional prohibition?

This view is sought to be sustained by force of the 10th section of the 1st article of the Constitution of the United States, which provides that no State shall pass any law "impairing the obligation of contracts."

The argument is, that the provisions in the railroad charter and amendment, conferring power upon the board of commissioners of the county, and making it their duty to subscribe for stock, and issue bonds therefor, if a majority of the qual-

ified voters of the county should determine at an election in favor of the same, import a contract with the railroad company on behalf of the State, which is protected by the clause referred to in the Constitution of the United States; and hence the State constitutional prohibition is inoperative to annul the subscription or the bonds. That this right to the subscription and bonds, resting upon a contract in the charter, is unaffected by any subsequent statute or organic law of the State.

Without stopping to inquire whether or not the power conferred upon the board of commissioners in the charter and amendments of the railroad company, in the form and with the conditions therein mentioned, constitutes a contract, the court is of opinion that, in view of the body upon which the power is conferred, and of the nature of the power itself, no such contract existed, if any, as is contemplated by this clause of the Federal Constitution. The power or authority contained in the charter, and out of which the right in question is claimed to arise, is conferred upon the county, a public corporation or civil institution of government, and upon public officers employed in administering its laws; and the power or authority itself concerns this body in its public political capacity.

Chief Justice Marshall observed, in Dartmouth College *v.* Woodward, (4 Wh., 627,) that the word contract, in its broadest sense, would comprehend the political relations between the Government and its citizens; would extend to offices held within a State for State purposes, and to many of those laws concerning civil institutions, which must change with circumstances and be modified by ordinary legislation, which deeply concern the public, and which, to preserve good government, the public judgment must control. But, he observes, the framers of the Constitution did not intend to restrain the States in the regulation of their civil institutions adopted for internal government, and that the instrument they have given us is not to be so construed, (p. 629.) And Mr. Justice Washington observed, in the same case, (p. 663,) in respect to public corporations, which exist only for public purposes, such as towns, cities, &c., the Legislature may, under proper limitations,

change, modify, enlarge, or restrain them; securing, however, the property for the use of those for whom, and at whose expense, it was purchased. (See also pages 693, 694.)

It would be difficult to mention a subject of legislation of more public concern, or in a greater degree affecting the good government of the county, than that involved in the present inquiry. The power conferred upon the board of commissioners by the provisions in the charter, among other things, embraced the power of taxation, this being the ultimate resort of paying both the principal and interest of the debt to be incurred in the subscription and issuing of the bonds.

The second question presented, upon which the judges differed, is as follows:

Whether, by virtue of said acts, and of the said election in the declaration set forth, the Ohio and Mississippi Railroad Company acquired any such right to the subscription of the defendants as would be protected by the Constitution of the United States against the new Constitution of Indiana, which took effect the 1st November, 1851.

The acts of 1848 and 1849, already referred to, made it the duty of the board of commissioners to subscribe for the stock, if a majority of the qualified voters at an election determined in favor of the subscription.

The election took place on the first Monday of March, 1849, when a majority of the votes was cast for the subscription. The Constitution of Indiana took effect 1st November, 1851. But the subscription was not made till the 10th September, 1852, and the bonds were issued after this date. It is insisted that the contract of subscription became complete when, at the election, a majority of the votes was cast in its favor, and did not require the form of a subscription on the books for the stock of the railroad company to make it obligatory upon the parties; and which, if true, it is agreed the contract would be protected within the Constitution of the United States, as it would then have been complete before the constitutional prohibition of Indiana. But the court is unable to concur in this view. It holds, that a subscription was necessary to create a contract binding upon the county, on one side, to take the

stock and pay in the bonds; and upon the other, to transfer the stock, and receive the bonds for the same. Until the subscription is made, the contract is unexecuted, and obligatory upon neither party.

We have arrived at the conclusion that both of the questions presented to us by the court below must be answered in the negative with some reluctance, as, for aught that appears in the case, the subscription to the stock by the board of commissioners was made and the bonds issued in good faith to the railroad company, and also sold by it, and purchased by the plaintiff in confidence of their validity; but, after the best consideration the court has been able to give the case, it has been compelled to hold, for the reasons above stated, that the subscription was made, and the bonds issued, in violation of the Constitution of Indiana, and therefore without authority, and void.

We have not been able to find that the courts of Indiana have passed upon this clause of their Constitution, and have, therefore, been obliged to expound it with the best lights before us. We should have felt very much relieved, if a construction had been given to it by the judicial authorities of the State, and have readily followed it.

### ORDER.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the district of Indiana, and on the points or questions on which the judges of the said Circuit Court were opposed in opinion, and which were certified to this court for its opinion agreeably to the act of Congress in such case made and provided, and was argued by counsel. On consideration whereof, it is the opinion of this court:

1. That by the act of incorporation of the Ohio and Mississippi Railroad Company of the 14th February, 1848, and the amendment thereto of January 15th, 1849, no such right to county subscriptions vested in said company as excluded the operation of the new Constitution of Indiana, which took effect on the 1st day of November, 1851.

2. That by the virtue of the said acts, and of the said election in the declaration set forth, the Ohio and Mississippi Railroad Company acquired no such right to the subscription of the defendants as would be protected by the Constitution of the United States against the new Constitution of Indiana, which took effect on the 1st day of November, 1851. Whereupon it is now here ordered and adjudged by this court, that it be so certified to the said Circuit Court.