## PRICKETT v. CITY OF MARCELINE.

### (Circuit Court, W. D. Missouri, W. D.   January 21, 1895.)

**1. MUNICIPAL INDEBTEDNESS—BASIS OF LIMIT—LAST ASSESSMENT.**
Under Const. Mo. art. 10, § 12, declaring that no city shall incur an indebtedness exceeding 5 per cent. of the value of its taxable property, "to be ascertained by the assessment next before the last assessment for state and county purposes, previous to the incurring of such indebtedness," an assessment cannot be considered which has not passed the state board of equalization.

**2. SAME.**
The extension by a city of the assessment for state and county purposes for taxation by the city for city purposes is not an assessment within the constitutional provision.

**3. SAME—BONDS—DATE OF INDEBTEDNESS.**
Under Rev. St. Mo. 1889, § 847, providing that before any bond issued by a city shall be valid it shall be presented to and registered by the state

auditor, the date of such recording is not the time when the municipal indebtedness is incurred, but the date of the execution and issue thereof, from which time, by their terms, they bear interest.

**4. SAME—RECITALS IN BOND—ESTOPPEL.**

Where a city has incurred an indebtedness in excess of the limits imposed by Const. Mo. art. 10, § 12, it is not estopped, by recitals in the bonds representing the indebtedness, from alleging their invalidity.

**5. SAME—CERTIFICATE OF STATE AUDITOR ON BONDS.**

A city may deny the validity of its bonds because creating an indebtedness in excess of the limit fixed by Const. Mo. art. 10, § 12, notwithstanding recitals thereon in the certificate of the state auditor, who, by provision of Rev. St. Mo. 1889, § 847, must register them before they shall be valid, it being further provided that his certificate shall be only prima facie evidence of facts therein stated.

**6. SAME—ENTIRE ISSUE OF BONDS INVALID.**

All the bonds of a single issue, which increases the indebtedness of a city beyond the constitutional limit, are invalid.

Action by William R. Prickett against the city of Marceline.

Suit on municipal bonds. The city of Marceline was incorporated as a city of the fourth class under the Missouri statutes in March, 1888. At that time it was but a village with few people, and its territory was little more than farming lands. Its board of council levied no taxes for city purposes that year. The Santa Fé Railroad was located through this town, and established there a division. Extensive coal fields adjacent to the city were soon opened up and developed. These things collected there quite a number of railroad operatives and miners, until in 1890 the census showed a population of this character of about 1,900. Its council, in June, 1890, submitted to the voters of the city the proposition to authorize the issue of bonds to the amount of $6,000, in denominations of $500 each, for the purpose of constructing therein a plant for lighting the city with electricity. The proposition was voted, and, on the 2d day of July, 1890, the bonds were issued, running for 20 years, with the right of earlier redemption, and with semiannual coupons of interest attached, payable January 1st and July 1st of each year. The bonds provided on their face that in case of default in payment of any of the interest coupons, at the election of the holder of the bonds, the principal and remaining coupons should become due and payable. The interest was paid by the city for two years, when the city declined to make further payment. The plaintiff, as holder of four of said bonds, aggregating the sum of $2,000 of principal, with attached coupons, and of other coupons detached from other bonds, brings this action to recover thereon. The defendant answers, admitting the issue of the bonds, but pleads that the same are invalid, for the reason that the then indebtedness of the city, together with the said bonds so attempted to be issued, in the aggregate, exceed 5 per cent. of the value of the taxable property within the said city of Marceline, ascertained by the assessment next before the last assessment of property of said city for state and county purposes previous to the attempt to incur said indebtedness, said indebtedness not being for the erection of a courthouse or jail. A jury being waived, the case is submitted to the court on the proofs. The evidence in the case shows that the assessed value of the property within said city, under the assessment of 1888, which was next before the last assessment of property in said city for state and county purposes, did not exceed $80,000.

H. A. & A. C. Clover, for plaintiff.

Harry K. West and Lathrop, Morrow, Fox & Moore, for defendant.

PHILIPS, District Judge (after stating the facts). It is important at the threshold of this discussion that the preliminary question should be disposed of as to what particular assessment must be referred to in ascertaining the valuation of the taxable property within the city, within the meaning of the state constitution, admitting the

creation of an indebtedness of $6,000, demanded by the issue of these bonds. The state constitution (article 10, § 12) is as follows:

"No county, city, town, township, school district or other political corporation or subdivision of the state, shall be allowed to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year without the assent of two-thirds of the voters thereof voting at an election to be held for that purpose; nor in cases requiring such assent shall any indebtedness be allowed to be incurred to an amount including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the assessment next before the last assessment for state and county purposes, previous to the incurring of such indebtedness; provided, that with such assent, any county may be allowed to become indebted to a larger amount for the erection of a courthouse or a jail. And provided further, that any county, city, town, township, school district or other political corporation or subdivision of the state, incurring any indebtedness requiring the assent of the voters as aforesaid, shall, before or at the time of doing so, provide for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for payment of the principal thereof, within twenty years from the time of contracting the same."

The value of the taxable property is "to be ascertained by the assessment next before the last assessment for state and county purposes, previous to the incurring of such indebtedness." The petition avers that the bonds were "made and issued  *  *  *  on or about the 2d day of July, 1890," and the bonds on their face show that they were executed on said day; and, in fact, they are by their terms made to bear interest from that date, and the petition discloses the fact that the holders of the bonds collected and received interest thereon from the 1st of July, 1890.

The contention of complainant's counsel that the debt did not attach until the 6th day of August, 1890,—the date when the state auditor indorsed his certificate of registration on the bond,—is, in my opinion, not tenable. The statute (section 847, Rev. St. Mo. 1889) provides that:

"Before any bond hereafter issued by any county, city, town, village or school district, for any purpose whatever, shall obtain validity, or be negotiated, such bond shall first be presented to the state auditor who shall register the same," etc.

The purpose of this statute was to invalidate and obstruct the negotiation of any such bonds unless so registered. But, when registered, the bond "issued by any county, city," etc., unquestionably relates back to the date of the issue, and becomes operative therefrom. The indebtedness, therefore, was created of date July 2d, 1890.

When was the last assessment prior to July, 1890, "for state and county purposes"? It is confounding the marked distinction between the act of assessment for state and county purposes, and the formal act of extending the assessment for taxation by the city officers for city purposes, to suggest that the latter constitutes an "assessment," within the meaning of the constitution. The assessment of property for state and county purposes is conducted alone by and intrusted to the county assessor, the state and county boards of equalization. While property held on June 1st of each year is

liable for taxes for the ensuing year (section 7569, Rev. St. Mo.), the assessor of the county is required, "between the first day of June and January, * * * to take a list of the taxable personal property in his county, town or district, and assess the value thereof," as provided (section 7531, Id.). And by section 7552 it is provided that:

"Real estate shall be assessed at the assessment which shall commence on the first day of June, 1881, and shall only be required to be assessed every two years thereafter. Each assessment of real estate so made shall be the basis of taxation on the same for the two years next succeeding."

The state constitution (article 10, § 18) provides that:

"There shall be a state board of equalization consisting of the governor, state auditor, state treasurer, secretary of state and attorney general. The duty of said board shall be to adjust and equalize the valuation of real and personal property among the several counties in the state, and it shall perform such other duties as are or may be prescribed by law."

This provision of the constitution is self-enforcing, without the aid of legislative enactment. Hannibal & St. J. R. Co. v. State Board of Equalization, 64 Mo. 294. The county assessor is required to make out and return to the county court, on or before the 20th day of January in every year, a copy of the assessor's book; and the clerk of the county court is required to make out, on or before the 20th day of February, an abstract of the assessment book, etc., and forward the same to the state auditor, to be laid before the state board of equalization. Rev. St. Mo. § 7571. The state board of equalization meets at the capitol of the state on the last Wednesday of February, 1884, and every two years thereafter, when the state auditor is required to lay before it the abstracts of all taxable property in the state returned to him by the county clerks; whereupon said board proceeds to equalize the valuation of the taxable property among the respective counties by adding "to the valuation of the property, real and personal, in each county, which they believe is valued below its true value in money, such per centum in each case as will raise it to its true value. Second, they shall deduct from the valuation of the property, real or personal, of each county, which they believe to be valued above its real value in money, such per centum as will reduce the same in each case to its true value." Id. §§ 7513, 7514. After the state board has completed its labors, the state auditor is required to transmit to each county clerk "the per centum added to or deducted from the valuation of the property of his county, specifying the percentage added to or deducted from the real property and the personal property, respectively, and also the value of the real and personal property of his county as equalized by said board; and the said clerk shall furnish one copy thereof to the assessor, and one copy to be laid before the annual county board of equalization." And the state auditor is required to see that the respective county clerks keep up the aggregate valuation of real and personal property in their counties, for those years in which no state board is held, to the aggregate amount fixed by the last state board of equalization. Id. § 7516. Then a county board of equalization is provided for, to meet on the first Monday in April in

each year, to hear complaints, and to equalize the valuation and assessments upon such property within the county; but they shall not reduce the valuation below the value fixed by the state board of equalization. Id. §§ 7517, 7518. The statute (sections 1603, 1604) then provides that the mayor of any city shall obtain from the county clerk of the county in which his city is located, on or before the 1st day of May, each year, a certified abstract from the assessment books of the property within the city made taxable by law for state purposes, and the assessed value thereof as fixed by the board of equalization, and upon this the city council is to establish by ordinance the rate of taxes for the year. From all which it is apparent, not only that the city, for any extension it may make for taxation, must accept the assessment made for state and county purposes for the year preceding by the state and county boards of equalization, but that, from the very necessities of executing the statutory plan or system, there could be no assessment in existence for the year 1890, when these bonds were issued. The statute allows the county assessor all the time between June 1st and the following January for listing and valuing the property. This is one step in the process of assessment. After he has completed his work, it is submitted to the county clerk's office, and through the clerk to the state auditor, and by him submitted to the state board of equalization, as demanded by the state constitution, for the purpose of revision, which would not occur until February, 1891. This is the second step, after which the county board of equalization acts finally, which does not convene therefor before the first Monday in April. So I repeat that, by the very terms of the statute, there was not, nor, indeed, could have been, any assessment for the year 1890, when these bonds were issued, nor when the state auditor made his certificate of registration. This is the view taken of a similar statute in this particular in the state of Illinois by its supreme court. Culbertson v. City of Fulton, 127 Ill. 30, 18 N. E. 781. The constitution of that state provides that the value of the taxable property must be ascertained by "the last assessment for state and county taxes previous to the incurring of such indebtedness." Of this the court says:

"Inasmuch as the indebtedness must be regarded as having been incurred at the date of the contract,—that is to say, August 15, 1887,—we must ascertain the value of the taxable property for the purposes of this case from the assessment for state and county taxes for the year 1886, and not for the year 1887. This is for the reason that the equalized value of the assessable property in the city of Fulton for the year 1887 was not arrived at by the action of the state board of equalization until the 1st day of October, 1887. It is the assessment as fixed by the state board which must govern, and the state board did not fix such assessment until after August 15th, the date of the incurring of the indebtedness."

The construction contended for by complainant would thwart the very object and policy of the framers of the constitution of 1875. The purpose in going back two years to "the assessment next before the last assessment for state and county purposes" was, inter alia, to free the work of valuation from any influences from or consideration for the local community who might desire to embark in such improvements as demanded an increase of the burdens of taxation on the

property owners, and to give the taxpayer, when asked for his suffrage to authorize the increase of taxes, a definite, fixed assessment to look at to see what additional tax he was to vote on himself. So there must be at the time the debt is created, and I think when his vote of consent is given, two antecedent completed assessments next prior thereto. This being so, the assessment made in 1888 is the one that must control this case. Excluding merchants' license tax (State v. Kansas City, St. J. & C. B. R. Co., 116 Mo. 15, 22 S. W. 611), the assessed value of all the property in the defendant city for the year 1888 was far below the constitutional limit to permit this debt. The assessed value of the property, real and personal, for 1888, for the entire school district, which includes the city of Marceline and additional territory, was only $89,945; whereas it would require a valuation of $120,000 to authorize the debt in question. This being true, the state constitution interposes and pronounces the bonds in question invalid, because the power to issue them could not then be evoked. Book v. Earl, 87 Mo. 250; Arnold v. Hawkins, 95 Mo. 569, 8 S. W. 718; Black v. McGonigle, 103 Mo. 193, 15 S. W. 615; State v. Town of Columbia, 111 Mo. 365, 20 S. W. 90; Marsh v. Fulton Co., 10 Wall. 676; Lake Co. v. Graham, 130 U. S. 674, 9 Sup. Ct. 654; Lake Co. v. Rollins, 130 U. S. 662, 9 Sup. Ct. 651; Sutliff v. Commissioners, 147 U. S. 230, 13 Sup. Ct. 318; Hedges v. Dixon Co., 150 U. S. 182, 14 Sup. Ct. 71.

Counsel for plaintiff lays much stress upon the recitals in the bonds, and the certificate placed thereon by the state auditor. Mr. Justice Jackson, in Hedges v. Dixon Co., supra, has answered the first suggestion quite effectually:

"The constitution of the state prescribed the amount which the county might donate to a railroad company. That provision operated as an absolute limitation upon the power of the county to exceed that amount, and it is well settled that no recitals in the bonds, or indorsement thereon, could estop the county from setting up their invalidity, based upon a want of constitutional authority to issue the same. Recitals in bonds issued under legislative authority may estop the municipality from disputing their authority, as against a bona fide holder for value; but, when the municipal bonds are issued in violation of a constitutional provision, no such estoppel can arise by reason of any recitals contained in the bonds."

The state auditor certified upon these bonds "that all the laws have been complied with in issuing the within bond, and that all the conditions of the contract under which it was ordered to be issued have been complied with (the evidence of which is on file), and that it is duly registered in my office." At the time this certificate was made, the last completed assessment in his office was for the year 1889. It ought to be a sufficient answer to the contention that this certificate should create an estoppel to say that the constitutional provision in question, which is self-executing, makes no provision for the registration of such bond or for such certificate. Its inhibition is absolute and unconditional. It was so made for a purpose. It was adopted at a time when local communities in the state were something like a wanton, surfeited and debauched in overindulgence, who suddenly becomes tense in the feeling of revulsion, and, uncertain of his moral forces, to withstand temptation,

takes refuge in a reformatory asylum. After years of reckless and ruinous prodigality in issuing municipal bonds by counties, cities, towns, and school districts, the taxpayers appealed first to the legislature, and afterwards to the constitutional convention of 1875, to take away the power of municipalities to create such debts, except upon the expressed consent of their constituent members, and then only for limited purposes and a limited amount. See Book v. Earl, 87 Mo. 251, 252, by Norton, J., who was a conspicuous member of the constitutional convention.

The first act of the legislature providing for the registration of such bonds by the state auditor was enacted in 1872 (Laws 1872, p. 57, par. 4), at the inception of the memorable bond litigation in the state and federal courts in Missouri. Its inspiration was rather to check than to facilitate the negotiation of municipal bonds. It was a well-known public fact that such bonds had been ordered executed secretly by some county and municipal officers, and surreptitiously put upon the market before the taxpayers were aware of the issue. This statute was designed to more effectually check such frauds. But, to guard the taxpayers against the possibility of collusion, negligence, or misinformation on the part of the state auditor, the legislature coupled with the act providing for registration and certification by the state auditor this express proviso:

"But such certificate shall be prima facie evidence only of the facts therein stated, and shall not preclude or prohibit any person from showing or proving the contrary in any suit or proceeding to test or determine the validity of such bonds or the power of any county court, city or town council, or board of trustees, or school board, or other authority, to issue such bonds; and the remedy of injunction shall also lie at the instance of any taxpayer of the respective county, city, town, village, township or school district, to prevent the registration of any bonds alleged to be illegally issued or funded under any of the provisions of this article."

Every purchaser of the bonds in question is presumed in law to have taken with notice of this proviso; and the state of the law is now well settled, in respect of the issue of bonds in excess of the constitutional limitation predicated of the assessed value of property within the municipality, that no recitals therein or thereon will exempt the purchaser from the obligation to first examine for himself the records of assessment, which are as open to him as the officers who make the recitals or certificate. Mr. Justice Mathews, in Dixon Co. v. Field, 111 U. S. 95, 4 Sup. Ct. 315, in respect of this issue, said:

"The amount of the assessed value of the taxable property in the county is not stated; but, ex vi termini, it was ascertainable in one way only, and that was by reference to the assessment itself,—a public record, equally accessible to all intending purchasers of bonds, as well as to the county officers. This being known, the ratio between the two amounts was fixed by an arithmetical calculation. No recital involving the amount of the assessed taxable valuation of the property to be taxed for the payment of the bonds can take the place of the assessment itself, for it is the amount, as fixed by reference to that record, that is made by the constitution the standard for measuring the limit of the municipal power. Nothing in the way of inquiry, ascertainment, or determination as to that fact is submitted to the county officers. They are bound, it is true, to learn from the assessment what the limit upon their authority is, as a necessary preliminary in the exercise of their func-

tions and the performance of their duty. But the information is for them-selves alone. All the world besides must have it from the same source, and for themselves. The fact, as is recorded in the assessment itself, is extrinsic, and proves itself by inspection, and concludes all determinations that contradict it."

Counsel for plaintiff relies upon the observations of Mr. Justice Brewer in Cairo v. Zane, 149 U. S. 123, 13 Sup. Ct. 803, for his sug-gestion that the effect of the certificate of registration by the state auditor has been enlarged in favor of the bona fide purchaser. That is not this case. In the first place, it does not appear that the stat-ute of Illinois imposing the duty of registering such bonds by the state auditor qualifies the effect of the certificate by a proviso sim-ilar to that of the Missouri statute. In the second place, the argu-ment of the learned justice was more of a suggestion as to what the equity of the certificate should be held to be than a conclusion of the court by any affirmative declaration of law. The language of the opinion is also to be restrained to the fitness of the subject-matter. The matter under discussion was not as to the power of the city of Cairo to issue bonds in payment of a subscription to a railroad company, but rather as to the effect on the validity of some of the bonds, in the hands of a bona fide purchaser, of an arrange-ment between the city and the railroad company by which the city parted with its stock in the company in consideration of a return to it of a portion of the bonds. As this, at most, was an act super-venient, the doctrine of estoppel might well be invoked in favor of the bona fide purchaser.

The ordinances under which the bonds were voted and issued, and the issue of the entire amount ordered, being an entirety, in an action at law on the bonds they are one and indivisible, and the whole issue is void. Hedges v. Dixon Co., 150 U. S. 182, 14 Sup. Ct. 71. It results that the issues are found for the defendant.