### TRUMAN v. INHABITANTS OF TOWN OF HARMONY.

(District Court, D. Maine. July 22, 1912.)

No. 686.

**1. Towns (§ 52*)—Bond Issues—Excess of Debt Limit—Validity.**

That an issue of bonds by a town in aid of railroad construction exceeds the 5 per cent. debt limit prescribed by Const. Me. art 22, an amendment passed February 9, 1877, does not prevent a court in equity from enforcing liability to the extent that the town could legally borrow; no difficulty of accounting or in applying the proceeds of the bonds appearing.

[Ed. Note.—For other cases, see Towns, Cent. Dig. §§ 90–94; Dec. Dig. § 52.*]

**2. Towns (§ 52*)—Constitutional Debt Limit—Innocent Purchasers.**

No one is presumed to be ignorant of the invalidity of bonds issued by a city or town in violation of the 5 per cent. debt limit prescribed by Const. Me. art. 22, passed February 9, 1877, and a holder of such bonds cannot recover on the ground that he is an innocent purchaser.

[Ed. Note.—For other cases, see Towns, Cent. Dig. §§ 90–94; Dec. Dig. § 52.*]

**3. Towns (§ 46*)—Debts—Authority to Incur.**

A town's right to borrow money depends upon the Constitution and laws of the state.

[Ed. Note.—For other cases, see Towns, Cent. Dig. §§ 81–84; Dec. Dig. § 46.*]

**4. Towns (§ 52*)—Bonds—Validity—Pleading.**

A bill for equitable relief by a holder of an excessive issue of bonds by a town, so far as the bonds were within the debt limit, is sufficient as against demurrer, though the bonds recite that they were issued at a meeting at which there was an invalid vote, where the bill shows that the bonds were legally voted, except as to the excess above the debt limit, at a previous meeting not recited in the bonds.

[Ed. Note.—For other cases, see Towns, Cent. Dig. §§ 90–94; Dec. Dig. § 52.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Bill by Nathan H. Truman against the Inhabitants of the Town of Harmony. On demurrer to the bill. Demurrer over-ruled.

Thaxter & Holt, of Portland, Me., for plaintiff.
Merrill & Merrill, of Skowhegan, Me., for defendant.

HALE, District Judge. This case comes before the court upon defendant's general demurrer to the bill in equity. The material allegations of the bill are substantially as follows: After stating the jurisdictional facts, it alleges the holding of a meeting of the voters of the defendant town on June 20, 1895, at which the following vote was passed by a majority of 117 votes to 2:

"Moved that the town of Harmony vote to raise ($8,500) eight thousand five hundred dollars to aid in the construction of a railroad from Hartland to Harmony village in said Harmony and authorize its selectmen to enter into a contract with any party that said road shall be built to Harmony village and to subscribe for stock in said road to said amount as soon as said railroad company shall be organized by law or special charter. To issue bonds of said town to said railroad company when organized for said amount at such time and rate of interest as shall be deemed advisable by said selectmen on these conditions: That said party give a guarantee to the satisfaction of a committee to be chosen by said town, that the balance of the money over and above ($8,500) eight thousand five hundred dollars necessary for the construction and completion of said road and appurtenances to said Harmony village shall be subscribed and furnished said road equipped and operated. If however said railroad company prefer they need not give any guarantee to build said railroad. But the selectmen may issue said bonds and take stock in said railroad as above upon the completion of said road to Harmony village if within one year from date of this meeting."

The bill alleges further that a second special town meeting of the legal voters of said town was held May 11, 1896, at which a vote was passed by a majority of 81 votes to 42, extending the time of the contract to August 20, 1896; that no railroad had been built to said town of Harmony on July 13, 1896, nor any guaranty given; that on said July 13, 1896, a third special town meeting of the voters of Harmony was holden, at which it was voted by a majority of 149 votes to 41, in substance, that the votes of the town meeting of June 20, 1895, be ratified and confirmed, and the town be authorized to subscribe for and receive stock in said railroad company to the amount of $8,500, and that the sum of $8,500 be voted to the railroad company for said stock, and for the building and completion of the railroad to Harmony village; that the selectmen and treasurer of the town be authorized to issue the bonds of the town for such an amount, at a rate of interest not to exceed 4 per cent. per annum, and in such denominations, time, and form as they may deem to the advantage of the town; that they be further authorized to sell and deliver the bonds for the purpose of aiding said railroad company; and that the selectmen be authorized, upon receiving a sufficient guarantee that the road would be completed and operated to Harmony village within six months, to deliver the bonds, or proceeds thereof, to the railroad company.

The bill further alleges that, pursuant to the votes passed at these meetings, 17 bonds of the defendant town, of the par value of $500

each, were issued, and the form thereof prescribed. The form of the bond contains a promise of the town of Harmony to pay the bearer $500 August 1, 1916, at the Pittsfield National Bank, with interest at 4 per cent. per annum. The following statement is in the bond:

"This bond is one of a series of seventeen bonds of $500.00 each, amounting in the aggregate to $8,500.00, issued for the purpose of aiding the Sebasticook & Moosehead Railroad Company, and in conformity to the vote of said town, passed at a special meeting held July 13, 1896, which vote is recorded in the town records of the said town of Harmony."

Then follows the clause calling for the signature of the selectmen and treasurer, and the signatures of said officers; and then a description of the 40 coupons maturing every six months, giving the form of same, the details of which it is not necessary to state. The bill further alleges that all of said bonds were placed by the officers of the defendant town in the hands of the officers of the Sebasticook & Moosehead Railroad Company, with authority to negotiate and sell the same; that the bonds were sold and so negotiated; that all the bonds came into the hands of the plaintiff on November 24, 1896, who accepted the same as collateral security from one Joseph H. Johnson, then owner of the bonds, for a loan made at that time by the plaintiff to said Johnson for $6,800; that the plaintiff accepted the bonds in good faith, believing them to be valid and legal, and believing that all the requirements of the votes passed at the various town meetings had been complied with, and believing that the defendant town was in good financial condition, and was able to pay, and would pay, the bonds, both principal and interest, at maturity; that the note for $6,800 of said Johnson was not paid at maturity; that it has never been paid; that the said Johnson was insolvent and unable to meet the note; and that the plaintiff was obliged to accept the bonds in full satisfaction of the note, amounting with interest to more than $7,000. The bill further alleges that the defendant town refused to pay the coupons on said bonds whenever they became due, though demand was made—that is, has ever since refused to pay the interest on the bonds at maturity of said interest—and, on information and belief, that the reason for the refusal to pay the interest was that the bonds were not binding as legal obligations on the town, because the bonds were issued in excess of the town's legal and constitutional authority, inasmuch as a debt was thereby created which, together with the outstanding indebtedness, exceeded 5 per cent. of the assessed valuation of the town, 5 per cent. being the limit allowed by article 22 of the Constitution of the state of Maine; that the assessed valuation of the defendant town for the year 1896 was $171,777; that the permanent interest bearing debt of the town of Harmony at the date of the issuance of the bonds was approximately $4,000; that, therefore, the additional indebtedness that the town could at that time have legally incurred was approximately $4,500; that, by reason of the above facts, the plaintiff is without remedy at law to recover either the principal or interest on the bonds; that he is the owner of the whole issue of bonds; that he is ready and willing to deliver them up, canceling any part of the issue that the court may direct, if the

court shall decree that any part of the same is a legal obligation of the defendant town. The bill prays for an answer, for an accounting with the defendant town in order to ascertain what amount the valid indebtedness of the town is represented in the issue of bonds; that a decree may be entered declaring valid such portion of the bonds as the court may direct on the balance being canceled; and that the defendant town may be decreed to pay the interest due on the valid portion of the indebtedness, and for other and further equitable relief. To this bill the defendant filed a general demurrer, namely:

"That the bill does not contain any matter of equity whereon the court can ground any decree, or give to the plaintiff any relief against the defendant, and that it appeareth by the plaintiff's own showing by the bill that he is not entitled to the relief prayed for by the bill against the defendant."

[1, 2] 1. Was the bond issue of the defendant town void in toto by reason of its exceeding the constitutional debt limit of the town?

The plaintiff contends that, where a municipality issues bonds and creates a debt exceeding the debt limit imposed by law, in a suit in equity brought by a bona fide holder of the bonds, the court may declare such issue valid, and may enforce the same to the extent that the town might legally have borrowed, on the date when the bonds were issued.

Article 22 of the Constitution of Maine, an amendment passed February 9, 1877, and adopted by the people at the ensuing annual election, provides as follows:

"No city or town shall hereafter create any debt or liability, which singly or in the aggregate with previous debts or liabilities shall exceed five per centum of the last regular valuation of said city or town; provided, however, that the adoption of this article shall not be construed as applying to any fund received in trust by said city or town, nor to any loan for the purpose of renewing existing loans or for war, or to temporary loans to be paid out of money raised by taxation, during the year in which they are made."

This provision of the Constitution was intended to prevent municipalities of the state from becoming indebted to an extent which would threaten permanently to retard their growth. All acts in contravention of this provision are held by the court to be void. And no one is presumed to be ignorant of the invalidity of bonds issued in violation of it. If the issue of bonds is made without authority, the holder of such bonds cannot recover on the ground that he is an innocent purchaser. Pendleton County v. Amy, 13 Wall. 297, 304, 20 L. Ed. 579; Aspinwall v. Commissioners of Daviess County, 22 How. 364, 379, 16 L. Ed. 296. In Hedges v. Dixon County, 150 U. S. 182, 188, 14 Sup. Ct. 71, 37 L. Ed. 1044, in 1893 the United States Supreme Court held that, where a county issued bonds in excess of its authority as a donation on its part, a court in equity could not allow the surrender and cancellation of so much of the bond issue as might be found to exceed the limit authorized by law, and declare the residue of such bonds valid, and that it could not enforce the payment of such residue against the county. In speaking for the court, Mr. Justice Jackson said:

"What the county authorized and carried into execution in the present case, both by the vote and by the donation, was one entire transaction; and, if it

should be so reformed as to curtail the entire issue of bonds to such an amount as was within the constitutional limits of the county to donate, it would be something different from that which was voted by the county and carried ino effect by the issue of the bonds. This would involve the making of a different donation from what the county voted and intended to make to the railroad company."

The court distinguished that case from Daviess County v. Dickinson, 117 U. S. 657, 6 Sup. Ct. 897, 29 L. Ed. 1026, where the county had voted a subscription of $250,000 to a railroad company; and, where without authority the officers of the county issued bonds to the amount of $300,000, the court held that the power to issue bonds was limited to $250,000, and that the bonds in excess of that amount were unlawful and void. The Dixon County Case arose upon a distinct matter of donation. The court commented upon the fact that the purchasers of the bonds from the railroad company did not pay any consideration therefor to the county, so as to raise any equity against it for the amount of the bonds, or for any part thereof. In Everett v. Independent School District (C. C.) 109 Fed. 698, 702, a decision of the United States Circuit Court of the Northern District of Iowa, in 1901, Judge Shiras, afterwards Mr. Justice Shiras of the United States Supreme Court, said:

"The true purpose of the present suit is to ascertain what number or part of the bonds issued by the school district of Rock Rapids, as it existed in 1879, can be enforced against the several districts now representing the original district, without infringing the constitutional limitation; and I am not able to perceive the force of the argument, whereby it is sought to maintain the proposition that the constitutional provision prohibits judicial inquiry into the actual facts in order to determine whether the whole or any part of the indebtedness represented by the bonds in suit can be enforced without violating the constitutional limitation. If the contention of the defendant districts be sustained, it results in the holding that a municipal corporation, the indebtedness of which has not reached the limit, may issue bonds slightly in excess of the limit, sell the same for full value, use the money in paying off all its debts, and then repudiate the last issue of bonds, and by so doing wholly free itself from all liability at law or in equity. Such a rule would convert the constitutional provision which was intended as a protection against excessive taxation into a potent method of perpetrating frauds of the most unblushing character."

Judge Shiras also commented upon the Dixon County Case, and drew the distinction arising from the fact that the cause then before the Circuit Court did not involve the question of donation, but presented a case where distinct equities had arisen, and where the bonds had been issued upon a valuable consideration. The court held that the constitutional provision did not prohibit the inquiry on the part of a court in equity as to the actual facts, in order to determine whether any of the bonds issued could be enforced without violating the true meaning of the constitutional limitation. And this the court called the pivotal point in the case; and it further held that where a corporation, for value, has issued a series of bonds which it refuses to pay, on the ground that such issue increased its indebtedness beyond the constitutional limits, a court in equity, at suit of the bondholders, may inquire into the facts to ascertain what part, if any, of the debt thus created can be enforced without violating the con-

198 F.—36

stitutional limit. Judge .Shiras held substantially the same doctrine in the Lyon County Cases (C. C.) 82 Fed. 929; Id. (C. C.) 95 Fed. 325. When this question was first presented to courts of equity, the difficulty of making a proper accounting was encountered in cases where there were several issues of bonds, or where the contracts were incumbered by different requirements. In Dillon on Municipal Corporations (5th Ed.) 1911, § 203, is found an excellent statement of the equitable rule:

"Partial Validity of Obligation.—If the city has not reached the constitutional limit of its indebtedness at the time when the obligation is incurred, but has so nearly approached the limit that only a part of the amount agreed to be paid is within the limit and the remainder beyond, the question arises to what extent the obligation is valid. If the debt is evidenced by bonds which are issued and delivered at different dates, the bonds first issued and delivered are valid, although the remainder of the issue may exceed the constitutional limit. If, however, the bonds are issued at the same time, or as a part of one transaction, or if the contract calls for the payment of a gross sum, which in part only exceeds the constitutional limit of indebtedness, the just and equitable rule as we regard it has been adopted that each obligation should be void in a sum in proportion to the excess and valid as to the remainder."

I find no other decisions of the United States Supreme Court upon this subject which require discussion. Other federal courts have considered the question in Francis v. Howard (C. C.) 50 Fed. 44; s. c., 54 Fed. 487, 4 C. C. A. 460; Columbus v. Woonsocket Inst. of Savings, 114 Fed. 162, 52 C. C. A. 118; Keene Five Cent Savings Bank v. Lyon County (C. C.) 97 Fed. 159; Prickett v. City of Marceline (C. C.) 65 Fed. 469. It will be seen that wherever the question has arisen in the federal courts in an action at law the courts have been compelled to hold that it was beyond their power to determine questions of the order in which the series of bonds were to be divided, or to make proper accountings. And in many cases courts of law have failed to take jurisdiction. The case at bar did not arise upon a donation. The defendant town subscribed for stock in a railroad. It must be assumed from the pleadings that the town in taking stock took, and intended to take, value. The bonds appear to have been issued upon a valid consideration. The town exceeded its debt limit in its issue of bonds; and the amount of this excess is shown in the bill. No question arises involving any difficulty of accounting or of the application of the proceeds from the sale of the bonds. The case presents none of the difficulties met with in many of the cases in equity on this subject in federal courts. In my opinion the fact that the issue of bonds in this case created a debt exceeding the limit of the indebtedness allowed by the Constitution of the state, ought not to, and does not, prevent a court in equity from enforcing the payment of such bonds to the extent that the town could legally borrow.

[3, 4] 2. Were the bonds issued and negotiated under a valid vote of the defendant town?

It must be said· that whatever rights the defendant town had to borrow money it acquired by the Constitution· and laws of the state of Maine. Hooper v. Emery, 14 Me. 375; Alley v. Edgecomb, 53

Me. 448. I have already referred to the constitutional provision forbidding a municipality from creating any debt exceeding 5 per cent. on its last valuation. At the time the defendant town attempted to issue the bonds in question, the Revised Statutes of the state of Maine of 1883 (chapter 51, § 135) provided as follows:

"A city or town by a two-thirds vote, at any legal meeting called for the purpose, may raise by tax or loan, from time to time, or all at once, a sum not exceeding in all five per cent. on its regular valuation for the time being, to aid in the construction of railroads, in such manner as it deems proper, and for such purpose may contract with any person or railroad corporation. At such meetings the legal voters shall ballot, those in favor of the proposition voting 'Yes', and those opposed, voting 'No'. The ballots cast shall be sorted, counted and declared in open town meeting and recorded, and the clerk shall make return thereof to the municipal officers, who shall examine such return, and if two-thirds of the ballots cast are in favor of the proposition, said officers shall forthwith proceed to carry the same into effect."

It appears by the plaintiff's bill that at the first meeting of the voters of the defendant town a vote was passed by more than the necessary two-thirds, providing for the issue of bonds. It appears further by the bill that a second special town meeting was held upon May 11, 1896; but no action was taken at this meeting which requires comment. On July 13, 1896, a third special meeting of the town was held. It was provided, however, in section 138 of chapter 51 of the Revised Statutes of Maine for 1883, that:

"Whenever a city or town has voted at any regular meeting thereof upon any question of loaning its credit to the taking of stock in, or in any way in aiding any person or corporation, said city or town shall not vote again upon the same subject except at its annual meeting."

When we examine the form of bonds set out in the pleadings, we find that they purport to have been issued "in conformity to the vote of said town, passed at a special meeting held July 13, 1896." And it is contended on the part of the defendant town that, inasmuch as it was forbidden to vote upon this subject at the meeting of July 13, 1896, the plaintiff cannot base the action of the town upon any authority not stated in the bond; but that the whole issue of bonds is void, both at law and in equity. The learned counsel for the defendant urges that the manifest purpose of the statute was to protect towns from hasty, dangerous, and ill-advised legislation; that the state wisely forbade towns from voting more than once at a special meeting upon a proposition to increase its debt limit, and that this provision is an absolute prohibition of action except at the annual meeting; that the recital in the bonds must be held as conclusive and final; that they were issued under a vote passed at an illegal special meeting; and that there can be no estoppel upon the defendant town to deny that it complied with the vote passed at the first meeting.

The plaintiff contends that the authority to issue the bonds which had been given by the town meeting of July 20, 1895, the first meeting, had never been revoked; that no additional power was attempted to be given by the meeting of July 13, 1896; that this third meeting sought merely to ratify the acts of the first meeting; that it appears by the bill that the conditions and requirements of the vote passed

at the first town meeting were complied with in the issuance of the bonds; that if the third town meeting, namely, that of July 13, 1896, had never been held at all, the power of the town to issue bonds could not have been questioned; that, if the third meeting could give no authority to issue the bonds, it certainly could not take away the authority which had been given by the vote passed at the first town meeting, namely, that of June 20, 1895.

In Wilkes County Com'rs v. Coler, 113 Fed. 727, 51 C. C. A. 399, the Court of Appeals for the Fourth Circuit held that if there was, in fact, an act which gave authority for the issue of bonds, such bonds were valid, notwithstanding they purported to have been issued under the authority of an illegal statute, and even though this illegal statute was recited as the authority for the issue. In speaking for the court, Judge Morris said:

"The recitals of the bonds in suit are as follows: That the bond is issued by authority of an act of the general assembly of North Carolina ratified the 20th day of February, A. D. 1879. This act being an invalid enactment, and not a law, so far as it undertakes to give power to issue bonds, this recital does not preclude inquiry as to whether or not there was such a law, and the existence of legislative authority. Northern Nat. Bank v. Trustees of Porter Tp., 110 U. S. 608, 4 Sup. Ct. 254, 28 L. Ed. 258. But the recital of an invalid act does not preclude inquiry as to whether there was in existence any other valid legislative authority under which power to issue the bond could be upheld. Wilkes County v. Coler, 180 U. S. 506, 524 [21 Sup. Ct. 458, 45 L. Ed. 642]."

The court cited many other authorities. This decision of the Circuit Court of Appeals was confirmed by the Supreme Court in Wilkes County Commissioners v. Coler, 190 U. S. 107, 23 Sup. Ct. 738, 47 L. Ed. 971, where the court said that the invalidity of the act of 1879 as conferring power to issue the bonds did not estop holders of bonds from showing that there was in fact ample authority to issue the bonds. It appears to be well settled that, if there is any authority under which the bonds may be issued, the court will hold them valid, even though they purport to be issued by reason of some invalid authority; and even though the municipal officers issuing them assume that their only authority to issue came from what proved to be an invalid source. Fernald v. Town of Gilman (C. C.) 123 Fed. 797; Knox County v. Ninth Nat. Bank, 147 U. S. 91, 13 Sup. Ct. 267, 37 L. Ed. 93; Dillon, Municipal Corporations (5th Ed. 1911) § 936; Evansville v. Dennett, 161 U. S. 434, 16 Sup. Ct. 613, 40 L. Ed. 760.

After a careful examination of the pleadings in the case before me, I am of the opinion that the allegations of the bill show that the vote of the first town meeting gave the town officers power to issue and negotiate the bonds therein described; and that, even though the bonds purported to have been issued by an invalid vote, they were authorized by a valid vote, the requirements of which were carried out by the town officers. The bill alleges that the bonds were issued "pursuant to the votes passed at these meetings," referring to all the meetings. If there is enough in the bill to show that the town officers derived power from the vote at any meeting to issue and negotiate the

bonds, the demurrer ought not to be sustained. I think it the plain duty of the court to overrule the demurrer, especially under the rule stated by the United States Supreme Court in Kansas v. Colorado, 185 U. S. 125, 145, 147, 22 Sup. Ct. 552, 46 L. Ed. 838, applying to suits in equity where the issues are raised on demurrer.

The demurrer is overruled. The defendant may answer further under the equity rules.