THE COOPER HOSPITAL, DEFENDANT IN ERROR, v. THE CITY OF CAMDEN, PLAINTIFF IN ERROR.

Argued December 3, 1902—Decided March 9, 1903.

1. The charter of a private corporation, enacted before the adoption of the constitutional amendments of 1875 and containing an exemption of the property of the corporation from taxation, might, if granted for a valid consideration moving to the state, and if accepted and acted upon by the recipient according to its terms, become a contract binding upon the state, and, by force of the federal constitution, irrepealable.

2. Until such charter was accepted and the consideration actually paid or delivered according to its terms, it remained subject to repeal, either by act of the legislature or by act of the people in amending the constitution.

3. The constitutional amendments of 1875, providing (*inter alia*) that "property shall be assessed for taxes under general laws and by uniform rules, according to its true value," had the effect of abrogating any special law for the assessment of taxes and any special immunity from taxation theretofore granted and not already accepted in such manner as to constitute a contract.

4. The charter of the Cooper Hospital, approved March 24th, 1875 (*Pamph. L. (Private acts)*, p. 170; *Pamph. L.* 1877, p. 391), appears upon its face to have been enacted in consideration of certain donations of land and the appropriation of certain moneys, proposed to be made by persons designated in the act, the same to be devoted to certain public purposes therein specified. The charter declared that the property and effects of the corporation, held or used for the purposes contemplated by the act, should not be subject to the imposition of any tax or assessment. The case shows that before the corporation was endowed in the manner contemplated in the charter, the exemption from taxation was annulled by the adoption of the constitutional amendments of 1875. *Held* (assuming, but not deciding, that the hospital is a private corporation within the doctrine of irrepealable charters, and that the charter was in form such as to amount to a contract), that the case does not show an acceptance of the charter and payment or delivery of the consideration according to its terms, so as to constitute a contract between the state and the Cooper Hospital, providing for the exemption of the property of the corporation from taxation.

5. Under the supplement passed May 16th, 1894, to the General Tax law of 1866 (*Gen. Stat.*, p. 3320), lands held by a charitable institution as a part of its endowment are not exempted.

6. In the supplement of May 16th, 1894, to the General Tax law of 1866 (*Gen. Stat.*, p. 3320), the exemption of "buildings used exclusively for charitable purposes, with the land whereon the same are erected, and which may be necessary for the fair enjoyment thereof," is confined to buildings and land in and upon which the charitable work is actually conducted.

7. The case of *Cooper Hospital* v. *Burdsall*, 34 *Vroom* 85, overruled.

8. The case of *Sisters of Charity* v. *Township of Chatham*, 23 *Vroom* 373, distinguished.

On error to the Supreme Court, whose opinion is reported *ante p.* 208.

For the plaintiff in error, *Henry M. Snyder, Jr.*

For the defendant in error, *John S. Voorhees* and *Theodore B. Booraem.*

The opinion of the court was delivered by

PITNEY, J.    By this writ of error and five others that were brought on for argument at the same time the city of Camden seeks to reverse judgments of the Supreme Court setting aside as illegal certain taxes that were assessed for city, county and

municipal purposes, in the years 1897 and 1898, upon certain parcels of real estate that are alleged to be owned by the Cooper Hospital. By a seventh writ of error the city brings before us the judgment of the Supreme Court setting aside an assessment of sewer taxes, for the year 1898, upon one of those properties.

The hospital claims immunity upon two grounds, viz.:

*First.* That an irrepealable contract is to be found in the charter of that institution, by which its property is exempted from taxes and assessments. *Pamph. L.* 1875 (*Priv. L.*), p. 170.

*Second.* That if not thus exempted by the charter, the property in question is exempt under the General Tax act of May 16th, 1894. *Gen. Stat.,* p. 3320.

The Supreme Court held that the charter exemption was annulled, so far as related to ordinary taxation, by the constitutional amendment adopted in September, 1875, requiring that property shall be assessed for taxes under general laws. But, following the decision of the same court in *Cooper Hospital* v. *Burdsall,* 34 *Vroom* 85, it held that an exemption of the property in question from ordinary taxation arises from the Tax act of 1894.

At the same time the court held that the constitutional amendment does not relate to assessments for special benefits derived from local improvements. *State, Protestant Foster Home* v. *Mayor, &c., of Newark,* 7 *Vroom* 478; *Catholic Protectory* v. *Kearney,* 27 *Id.* 385. Therefore, finding the charter exemption of the Cooper Hospital unrepealed, so far as such assessments are concerned, either by the constitutional amendments or by any subsequent legislative act, and dealing with case No. 7 between these parties as involving an assessment for special benefits, the court set aside that assessment as violative of the charter exemption. The record in this case, however, discloses simply "a certain assessment for sewer taxes for the year 1898." We are referred to the act of March 6th, 1882 (*Pamph. L.,* p. 60; *Gen. Stat.,* p. 605), as showing the legislative authority for the construction of the sewer in question. That act authorizes the board of aldermen, under certain cir-

cumstances, to cause sewers to be constructed; and if, in the judgment of that board, the construction of such a sewer is likely to benefit any lands in its vicinity, the act provides for the appointment of commissioners, who are to determine what lands are peculiarly benefited, and what portion of the whole cost of the work is to be assessed upon the city at large and what sum is to be assessed upon each parcel of land peculiarly benefited. In case the whole expense of the work exceeds the amount of the benefits, the excess is required to be paid by the city at large and raised by general tax; and the duty is expressly imposed upon the board of aldermen to incorporate in the annual tax levy, in each year, such amount as shall be required to be paid by the city at large on account of any such improvement.

The form of the return in case No. 7 shows a general tax to defray the expenses of sewer construction or maintenance, and not a special assessment imposed upon the property in question by reason of the peculiar benefits conferred thereon. The distinction referred to in the *Foster Home Case, 7 Vroom* 478, and the *Catholic Protectory Case, 27 Id.* 385, is between taxes imposed upon property at large, assessed according to the value of the property, and "exactions for special benefits derived from local improvements," which are laid in proportion to the benefits received by the several properties in question. The "sewer taxes" here in question belong in the former category, as well as the "city, county and municipal taxes" that are involved in the remaining six cases.

Does the case show a contract between the state and the Cooper Hospital, exempting from taxation the several properties in question?

By the federal constitution (article 1, section 10) it is declared that no state shall pass any law impairing the obligation of contracts. That an irrepealable contract, within the meaning of this clause, may be embodied in the charter of a private corporation enacted by a legislature having power to grant the same is the necessary result of the doctrine laid down in the great *Dartmouth College Case, 4 Wheat.* 518. That such a charter may even contain a contract exempting

the property of the corporation from taxation, and if so granted for a valid consideration moving to the state, and accepted and acted on by the recipient, may become binding on the state according to its terms, is established by a line of decisions in the United States Supreme Court, and is, of course, recognized by this court. *Gordon* v. *Appeal Tax Court,* 3 *How.* 133; *Piqua Branch of State Bank of Ohio* v. *Knoop,* 16 *Id.* 369; *Dodge* v. *Woolsey,* 18 *Id.* 331; *Home of the Friendless* v. *Rouse,* 8 *Wall.* 430; *Wilmington Railroad Co.* v. *Reid,* 13 *Id.* 264; *New Jersey* v. *Yard,* 95 *U. S.* 104; *Farrington* v. *Tennessee, Id.* 679; *State Board of Assessors* v. *Morris and Essex Railroad Co.,* 20 *Vroom* 193; *Mount Pleasant Cemetery Co.* v. *Newark,* 23 *Id.* 539; *Singer Manufacturing Co.* v *Heppenheimer,* 29 *Id.* 633; *Hancock* v. *Singer Manufacturing Co.,* 33 *Id.* 289.

Our legislature is now prevented from granting an irrepealable charter, by force of the constitutional amendments of 1875. The charter of the Cooper Hospital antedates those amendments.

A contract that disables the state from exercising the sovereign prerogative of taxation, with respect to the property of a given corporation, is in derogation of common right, and, so far as it goes, is subversive of the power of government itself. Every reasonable intendment is against the existence of such a contract. He who comes into court asserting its existence must be prepared to show that, in fact, it was made as alleged, and that its terms are such as to reasonably admit of no other interpretation than that claimed.

Upon an examination of the charter of the Cooper Hospital, which is set forth in full below, two questions at once arise, viz.: *First.* Can this institution be deemed a private institution, within the doctrine of irrepealable charters, in view of the fact that its powers were conferred solely for public purposes, and not for the individual profit of any person or persons? *Secondly.* Inasmuch as the charter was enacted while there stood upon the statute-book the provision of section 6 of the General Corporation act of 1846 (*Rev. of 1847, p.* 136), that the charter of every corporation thereafter

granted should be subject to alteration, suspension and re-
peal, in the discretion of the legislature, is not this provision
fairly to be read into the charter, so as to negative the notion
that the charter was intended to embody a contract with
respect to the exemption from taxes?

But these questions we have not found it necessary to con-
sider, because the evidence in the case before us leaves the
original making of the alleged contract, as a matter of fact,
unproven. It is entirely clear that the mere enactment of a
corporate charter does not in and of itself alone amount to
the making of a contract within the meaning of the federal
constitution. In order to constitute a contract binding upon
the state there must be acceptance by the parties of the other
part, accompanied by the passing of a consideration substan-
tially in accordance with the terms of the charter. Doubtless
such acceptance might follow within a reasonable time after
the enactment, unless by the terms of the charter a limit of
time were specified. But it seems too plain for argument
that, until accepted, the charter remains subject to repeal,
either by act of the legislature or by act of the people in the
form of a constitutional amendment. And if the charter be
repealed in part before acceptance, a contract will arise only
with respect to the part remaining unrepealed.

The Cooper Hospital was incorporated under the name of
the Camden Hospital by an act approved March 24th, 1875
(*Pamph. L. (Priv. L.), p.* 170), which is in the following
terms:

"WHEREAS, it is proposed by the devisees of William D.
Cooper, deceased, late of the city and county of Camden, in
the state of New Jersey, and Alexander Cooper, to convey
certain lands in the said city of Camden to Albert W. Mark-
ley, Peter L. Voorhees, Charles P. Stratton, Rudolphus Bing-
ham, Thomas F. Cullen, Joseph B. Cooper, Augustus Reeve,
Alexander Cooper and John W. Wright, as trustees for the
purpose of erecting thereon a building or buildings to be used
as a free hospital, and to appropriate moneys for the mainte-
nance and support of the same, pursuant to the wishes and
directions of the said William D. Cooper, deceased; *and*

*whereas,* it is considered that the benevolent intention of the projector of such institution and of the said donors can be better carried out, and the objects sought to be accomplished facilitated and promoted by an act of incorporation; therefore,

"1. BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey,* That Albert W. Markley, Peter L. Voorhees, Charles P. Stratton, Rudolphus Bingham, Thomas F. Cullen, Joseph B. Cooper, Augustus Reeve, Alexander Cooper and John W. Wright be and they are hereby constituted and made a body politic and corporate in fact and in law by the name of 'The Camden Hospital,' and by that name they and their successors shall have perpetual succession, power to sue and be sued, to make and use a common seal, to purchase, take, have, hold, receive and enjoy any lands, tenements or hereditaments in fee-simple or otherwise, and any goods, chattels or property of any description, real or personal, whether acquired by gift, grant or otherwise, and to grant, convey, lease, assign, sell or otherwise dispose of the same for the purposes of the said corporation.

"2. *And be it enacted,* That the object of said corporation shall be to afford gratuitous medical and surgical aid, advice, remedies and care to such invalid or needy persons as, under the rules and by-laws of said corporation, shall be entitled to the same, and to construct such buildings and make such provisions as are necessary for the accomplishment of said object.

"3. *And be it enacted,* That the incorporators of this act shall continue the board of managers of said corporation, and shall have exclusive control of the management and business concerns of said institution, both external and internal; shall have authority to fill vacancies in their own board, however occasioned, and to make such constitution and by-laws for the regulation of their organization and the conduct of their business as they may deem necessary.

"4. *And be it enacted,* That the property and effects of the said corporation, held or used for the purposes contemplated by this act, shall not be subject to the imposition of any tax or assessment.

"5. *And be it enacted,* That this act shall take effect immediately."

` A supplement approved March 6th, 1877 (*Pamph. L., p.* 391), changes the name of the corporation, but makes no other amendment of the charter.

It will be seen that the consideration upon which the legislature was induced to offer this corporate franchise and the immunity from taxes and assessments was the proposed conveyance to be made by the devisees of William D. Cooper, deceased, and Alexander Cooper, of certain lands in the city of Camden to trustees for the corporation, for the purpose of erecting thereon a building or buildings to be used as a free hospital, and the appropriation by the same parties of moneys for the maintenance and support of the hospital, with the object of affording gratuitous medical and surgical aid, advice, remedies and care to invalid and needy persons.

Whether the trustees did or did not promptly assume the corporate functions conferred upon them by the act does not appear from anything that is before us. But, in our judgment, in order to sustain the claim that a contract had arisen, it would require something more than the mere assumption and exercise of the corporate powers. Unless the devisees of William D. Cooper, deceased, and Alexander Cooper, made over to the corporation or its trustees the lands and moneys contemplated by the act, there was no such acceptance as would bind the state to refrain thereafter from subjecting the property of the corporation to taxes or assessments.

The case is devoid of evidence to show that Alexander Cooper ever conveyed any lands or made any appropriation of moneys for the purposes specified. The will of William D. Cooper is in evidence, and shows that his sole devisees were his brother, Richard M. Cooper, and his sisters, Sarah W. Cooper and Elizabeth B. Cooper. The evidence does not show that Richard M. Cooper or Sarah W. Cooper at any time conveyed lands or appropriated moneys to the uses of the hospital. And, so far as appears, Elizabeth B. Cooper did neither in her lifetime. She died in the year 1888, leaving a

will, by the terms of which it is claimed that the Cooper Hospital has acquired an equitable interest in three of the pieces of real estate that are involved in the present controversy. The other properties in question do not appear to have come from either of the devisees of William D. Cooper. One is claimed by devise from John W. Wright, who died in 1890; one by devise from Abigail M. Wright, who died in 1892, and one was acquired in satisfaction of a mortgage that was assigned to the Cooper Hospital in 1889.

The case, in short, does not show that the consideration contemplated by the legislature in 1875 has passed to the corporation for the purposes of its creation. So far as any endowment of the hospital, according to the scheme of the charter, is shown, it took place not earlier than the year 1888.

Meanwhile the people of the state, in the month of September, 1875, adopted certain amendments of the fundamental law, among which are the following:

"No donation of land or appropriation of money shall be made by the state or any municipal corporation to or for the use of any society, association or corporation whatever.

"The legislature shall not pass private, local or special laws * * * granting to any corporation, association or individual any exclusive privilege, immunity or franchise whatever.

"The legislature shall pass no special act conferring corporate powers, but they shall pass general laws, under which corporations may be organized and corporate powers of every nature obtained, subject, nevertheless, to repeal or alteration at the will of the legislature.

"Property shall be assessed for taxes under general laws and by uniform rules, according to its true value."

The general purpose of these amendments is sufficiently clear. The one last mentioned, whether considered alone or together with the context, has the effect of abrogating any special law for the assessment of taxes and any special immunity from taxation theretofore granted and not already accepted in such manner as to constitute a contract. In *Sisters of St. Elizabeth* v. *Chatham,* 22 *Vroom* 89 (at *p.* 91), Mr. Justice Dixon, speaking for the Supreme Court, said:

"That amendment was self-executing: *proprio vigore,* it annulled all laws which would interfere with its operation. There being in existence at the time of its adoption general laws under which property might be assessed for taxes, it commanded that assessments should be made under those laws and such other general laws as the legislature might exact, and abrogated all special or local laws which provided for any different assessments. It is addressed not merely nor primarily to the legislature, but directly to the assessing officers, and requires them to be guided by general laws, and by those only, in selecting the subjects of taxation and in apportioning the taxes thereon, and to ·disregard all statutes, ordinances or other regulations which would thwart the operation of such laws."

The view thus ·expressed was approved by this court in *Sisters of St. Elizabeth* v. *Chatham,* 23 *Vroom* 373, although the decision of the Supreme Court was reversed on another ground.

In a somewhat earlier case (*State, North Ward National Bank* v. *City of Newark,* 10 *Vroom* 380; *S. C.,* 11 *Id.* 558), Mr. Justice Depue (afterwards Chief Justice), in delivering the opinion of the Supreme Court, elaborately expounded the reasoning that leads to this view, and the result was accepted by this court.

Therefore the charter of the Cooper Hospital was annulled, so far as the tax exemption clause is concerned, before the hospital was endowed in the manner contemplated by the legislature when the charter was enacted. Any subsequent endowment was subject to that *pro tanto* repealer, and could not have the effect of creating a contract for tax exemption. This view is fully sustained by the decisions of the Supreme Court of the United States.

In *Aspinwall* v. *Commissioners of the County of Daviess,* 22 *How.* 364 (1859), it appeared that, by the charter of a railroad company, passed by the legislature of Indiana in 1848, and a supplement of 1849, the county commissioners of a county through which the road passed were authorized to

subscribe for stock in the railroad company and issue bonds to pay for the same, provided a majority of the qualified voters of the county should so.vote. A majority of the voters of Daviess county duly voted that a subscription should be made; but, before the subscription was made, the state adopted a new constitution, one of the articles of which prohibited such subscriptions unless paid for in cash, and also prohibited a county from loaning its credit or borrowing money for the purpose. After this constitution went into effect the county commissioners, pursuant to the vote previously taken, subscribed for stock in the railroad company and issued their bonds for the amount. It was held that a mere vote to subscribe did not of itself form an irrepealable contract; that, until the subscription was actually made, the contract was unexecuted and obligatory upon neither party, and that the bonds, having been issued in violation of the constitution of the state, were void.

In *Wadsworth* v. *Supervisors,* 102 *U. S.* 534 (1880), a substantially similar question was presented, and a like result was reached.

In *Town of Concord* v. *Portsmouth Savings Bank,* 92 *U. S.* 625 (1875), it appeared that a statute of the State of Illinois, in force March 7th, 1867, authorized certain towns, of which the town of Concord was one, to appropriate money to aid in the construction of a certain railroad, to be paid to the company as soon as its tracks should have been located and constructed through the town. The people of Concord, pursuant to the terms of the act, voted, in 1869, to make an appropriation, provided the company would run its road through the town. On June 20th, 1870, the company gave notice of its acceptance of the donation, and on October 9th, 1871, the town bonds were issued. Meantime, on July 2d, 1870, the constitution of the state came into operation, which forbade any city, town or township to make donations or loan its credit to a railroad company. *Held,* that the constitution rendered the act of 1867 thereafter ineffective; that the town was not empowered to make the donation until the road was located and constructed through the town; that the notice by the company that it would accept the donation did not amount to an under-

taking that it would build the road through the town; that the authority of the town to make the donation had been revoked before the donation was complete, and therefore there was no contract, and the town bonds were void.

To the same effect is *Norton* v. *Brownsville,* 129 *U. S.* 479 (1889).

In *Pearsall* v. *Great Northern Railway Co.,* 161 *U. S.* 646 (1895), it appeared that, in 1856, a railroad company was incorporated by the legislature of the territory of Minnesota, with authority to construct a railroad and to connect its road by branches with any other road in the territory, or to become part owner or lessee of any railroad in the territory. By a subsequent act, passed in 1865, it was authorized to connect with, or adopt as its own, any other railroad running in the same general direction, and to consolidate the whole or any portion of its capital stock with the capital stock of any road having the same general direction, or to consolidate any portion of its road and property with the franchise of any other railroad company. In 1874 the legislature of Minnesota enacted that no railroad corporation should consolidate its stock, property or franchises with, or lease or purchase the works or franchises of, or in any way control, any other railroad corporation owning or having under its control a parallel or competing line. And in 1881 enacted that no railroad corporation should consolidate with, lease or purchase, or in any way become owner of or control any other railroad corporation owning or controlling a parallel or competing line. Prior to the enactment of 1874 the railroad company in question had accepted the rights, privileges and franchises conferred by its charter and supplement, and had constructed and put in operation its railroad, but had not executed the power conferred by its charter to consolidate with other roads. It was held that this power, so long as it remained unexecuted, was within the control of the legislature, and might be treated as a license and revoked, and that such revocation did not amount to the violation of a contract. Therefore the railroad company was held subject to the provisions of the acts of 1874 and 1881. The reasoning of the court was summed up at the conclusion

of the opinion in the following words: "We hold that where, by a railway charter, a general power is given to consolidate with, purchase, lease or acquire the stock of other roads, which has remained unexecuted, it is within the competency of the legislature to declare, by subsequent acts, that this power shall not extend to the purchase, lease or consolidation with parallel or competing lines."

In *Bank of Commerce* v. *Tennessee,* 163 *U. S.* 416 (1895), the bank was chartered in 1856 by the State of Tennessee, and by its charter was required to pay to the state a fixed annual tax upon each share of the capital stock, "which shall be in lieu of all other taxes." The charter did not limit the maximum amount of the capital stock. In 1870, while the capital stood at $200,000, the state adopted a new constitution, which provided for the taxation of all property, a provision that the court held would include the shares issued since 1870, if not protected by the exemption clause in the charter. It was held that the clause in the charter providing for taxation amounted to a contract that the shares of stock in the hands of the shareholders should be exempt from further taxation than that which was provided in the charter; but that this contract obligation did not attach to the stock issued after the adoption of the constitution of 1870, and that the new stock was taxable, notwithstanding the charter. As Mr. Justice Peckham put it in his opinion (at *p.* 424), "the constitution impaired no obligation of an existing contract; it prevented the subsequent making of one."

In *Galveston, &c., Railway Co.* v. *Texas,* 170 *U. S.* 226 (1897), it was held, following *Pearsall* v. *Great Northern Railway Co.* and *Bank of Commerce* v. *Tennessee,* that a clause in a railway charter granting power to consolidate with, or become the owner of, other railroads is not a vested right that cannot be rendered inoperative by subsequent legislation passed before the company avails itself of the power thus granted.

We hold therefore that the case shows no contract between the state and the Cooper Hospital providing for the exemption of the property and effects of that corporation from the im-

position of taxes. Had the making of such a contract been shown, the question would still remain whether the exemption must not be limited to such property and effects as were acquired previous to the adoption of the constitutional amendments.

It remains to consider the claim of the hospital to exemption from taxes under the supplement, passed May 16th, 1894, to the General Tax act of 1866. *Gen. Stat., p.* 3320.

The Supreme Court did not find that, in fact, the parcels of real estate here in question, or any of them, are *used* exclusively for charitable purposes. The opinion below states that they are *"held* exclusively for the object for which the hospital · was incorporated." This means only (what, indeed, is entirely clear from the evidence) that the real estate in question constitutes a part of the endowment of the Cooper Hospital, whose rents, issues and profits are devoted to the support of the hospital itself. The buildings in which the work of the institution is conducted, and the lands upon which the same are erected, sufficient for the fair enjoyment of the hospital, are separate and distinct, are situate at a considerable distance from the properties now in question, and admittedly have not been taxed.

The supplement of 1894 amends section 5 of the act of 1866. The amendment consisted in the insertion of the words indicated in italics below, and the accidental omission of the words "the children of," where indicated in parentheses near the end of the section. As thus amended, the exempting clause in question reads as follows:

"That the following persons and property shall be exempt from taxation, namely:

\*    \*    \*    \*    \*    \*    \*    \*    \*

"II. All colleges, academies or seminaries of learning, public libraries, school-houses, buildings erected and used for religious worship, *buildings used as asylums or schools for the care, nurture, maintenance and education of feeble-minded or idiotic persons and children, provided such institutions are duly incorporated under the laws of this state,* and the land whereon the same are situate, necessary to the fair use and

enjoyment thereof, not exceeding five acres for each one, the furniture thereof and the personal property used therein, the endowment or fund of any religious society, college, academy, seminary of learning, public library *or institution for feeble-minded persons as aforesaid; provided,* that no building so used which may be rented for such purposes and rent received by the owner therefor shall be exempted; the stock of any corporation of this state, which, by charter or other contract with this state is expressly exempted from taxation, the stock of any corporation of this state, the capital whereof is by this act made taxable to and against said corporation, pews in churches, graveyards not exceeding ten acres of ground, cemeteries and all buildings erected thereon, and all buildings used exclusively for charitable purposes, with the land whereon the same are erected, and which may be necessary for the fair enjoyment thereof, and the furniture and personal property used therein, the funds of all charitable institutions and associations collected and held exclusively for the sick or disabled members thereof, or for the widows of deceased members or for the education, support and maintenance of (the children of) deceased members."

It will be seen at once that this enactment draws a clear distinction between *buildings* used for religious worship, &c., for asylums, and for exclusively charitable purposes, on the one hand, and the *endowment funds* of certain institutions, on the other. The endowments are exempted only when they pertain to a religious society, college, academy, seminary of learning, public library or incorporated institution for feeble-minded persons. The exemption of buildings, with the land whereon they are erected, is confined to such as are used directly in the work of the several institutions in question. That the exemption depends upon such actual user is apparent from the proviso that excepts from the exemption declared in the first part of the section any building so used which may be rented for such purposes and rent received by the owner therefor; the reference being to a building actually used for the purpose of religious worship, or the like, but owned by a lessor who is not engaged in the work. That

the endowments of such an institution as the one now under consideration are not exempted is further apparent from the express exemption in the latter part of the section of "the funds of all charitable institutions and associations *collected and held exclusively for the sick or disabled members thereof,"* &c.

Under the act as it stood prior to the amendment of 1894, this court held that an endowment of a religious society, college, academy, seminary of learning or public library, that consisted of land, was not exempt from taxation. *State, Nevin, pros.,* v. *Krollman, Collector,* 9 *Vroom* 574.

The decision in *Sisters of Charity* v. *Township of Chatham,* 23 *Vroom* 373, did not proceed at all upon the theory that real estate held as a part of the endowment of a charitable institution was exempt from tax under the act of 1866. The property there in question was the convent building of the sisters of charity, and was actually used for charitable purposes. The exemption of the residue of the property (which was a part of the same tract upon which the building was situate) proceeded upon a finding, as matter of fact, that the land was no more than was necessary for the fair enjoyment of the building. The property was farmed and its produce applied to the support of the inmates of the building.

The decision of the Supreme Court in *Cooper Hospital* v. *Burdsall,* 34 *Vroom* 85, which was followed as a binding authority by the same court in the present case, was based, we think, upon a misapprehension of the effect of the decision in Sisters of Charity *v.* Chatham. In the Burdsall case it seems to have been thought that because the Cooper Hospital is engaged in a charitable work, therefore all its real estate whose revenues are devoted to advance the work must be exempted from taxation. The statute is by no means so broad. It confines the exemption to the building in which the work is actually conducted, and the land upon which the building stands, so far as necessary for the fair enjoyment of the building.

Repeated adjudications in the Supreme Court and a recent decision in this court have established the principle that mere

ownership of land by a charitable institution does not exempt the land, and that its exemption depends upon its actual devotion to the work of charity. *Trustees* v. *Paterson,* 32 *Vroom* 420; *Lilz* v. *Johnston,* 36 *Id.* 169; *Congregation* v. *Brakeley,* 38 *Id.* 176; *Presbyterian Board* v. *Fisher, ante p.* 143; *Children's Seashore House* v. *Atlantic City, ante p.* 385.

It results that the several parcels of real estate in question are not exempted by the General Tax act of 1894.

The several judgments of the Supreme Court will be reversed.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, VAN SYCKEL, FORT, GARRETSON, HENDRICKSON, PITNEY, BOGERT, VREDENBURGH, VROOM. 9.